UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICKEY WHITE,

Petitioner,

Case No. 18-cv-13691
Hon. Matthew F. Leitman

v.

RANDEE REWERTS,

Respondent.

______________________________________________________________________/

**ORDER DENYING PETITIONER'S MOTION FOR BOND PENDING CONCLUSION OF HABEAS PROCEEDINGS (ECF No. 8)**

Petitioner Rickey White is a state prisoner in the custody of the Michigan Department of Corrections (the "MDOC"). White is currently incarcerated at the Carson City Correctional Facility ("Carson City" or "DRF"). White has served approximately 8 years of his sentence of 23 to 40 years imprisonment for his convictions of conducting a criminal enterprise and obtaining money by false pretenses with intent do defraud. (*See* Mot. for Bond, ECF No. 8, PageID.4485.)

On November 26, 2018, White filed a petition for habeas corpus. (*See* Habeas Pet., ECF No. 1.) On May 27, 2020, White filed a Motion for Bond Pending Conclusion of Habeas Proceedings. (*See* Mot. for Bond, ECF No. 8.) White argues that his habeas petition rasies a substantial claim of law and that the COVID-19 pandemic is an exceptional circumstance justifying his release. The Court, however,

concludes that White has not shown that exceptional circumstances warrant his release. Accordingly, White's Motion for Bond (ECF No. 8) is **DENIED**.

**I**

On July 26, 2012, White pleaded guilty in the 6th Judicial Circuit Court for the County of Oakland to one count of conducting a criminal enterprise and two counts of obtaining money by false pretenses. (*See* Plea Hr'g Tr. at 14:18–15:5, ECF No. 5-2, PageID.963–964.) On October 3, 2012, White was sentenced to concurrent terms of 23 years, 4 months to 40 years imprisonment for the criminal enterprise offense and 3 months to 30 years imprisonment for each of his false pretenses offenses. (*See* Habeas Pet., ECF No. 1, PageID.1; Sentencing Hr'g Tr. at 25:13–25, ECF No. 5-4, PageID.1012.) White was also ordered to pay $283,245 in restitution to his victims. (*See* Sentencing Hr'g Tr. at 26:1–3, ECF No. 5-4, PageID.1013.) White has served approximately 8 years of his prison term. (*See* Mot. for Bond, ECF No. 8, PageID.4485.)

White filed a habeas petition in this Court on November 26, 2018. (*See* Habeas Pet., ECF No. 1.) White claims that he was denied the effective assistance of counsel at both the trial stage and on direct appeal from his conviction. (*See id.*, PageID.7–8.)

On May 27, 2020, with White's habeas petition still pending, White filed a Motion for Bond Pending Conclusion of Habeas Proceedings (ECF No. 8). White

argues that his habeas petition presents a substantial claim of ineffective assistance of counsel. (*See* Mot. for Bond, ECF No. 8, PageID.4485–4486.) White also asserts that he is "at particular risk of serious illness from COVID-19" because he is a prisoner who suffers from "diabetes, hypertension/high blood pressure, [and] obesity," and White argues that his increased susceptibility to COVID-19 is an exceptional circumstance warranting his release on bond. (*Id.*, PageID.4481–4485.)

Warden Rewerts responded to White's motion on June 5, 2020. (*See* Gov't Resp. to Mot. for Bond, ECF No. 9.) The Court held a hearing on White's motion on June 29, 2020.

## II

The Court applies the following legal standard to a petitioner's motion for bond while his habeas petition is under review:

> This Court has "inherent authority" to grant bond to a habeas petitioner while his petition is under review. *Nash v. Eberlin,* 437 F.3d 519, 526, n. 10 (6th Cir. 2006). But that authority is narrow. "Since a habeas petitioner is appealing a presumptively valid state court conviction, both principles of comity and common sense dictate that it will indeed be the very unusual case where a habeas petitioner is admitted to bail prior to a decision on the merits in the habeas case." *Lee v. Jabe,* 989 F.2d 869, 871 (6th Cir. 1993). "In order to receive bail pending a decision on the merits, prisoners must be able to show not only a substantial claim of law based on the facts surrounding the petition but also the existence of 'some circumstance making [the motion for bail] exceptional and deserving of special treatment in the interests of justice." *Dotson v. Clark,* 900 F.2d 77, 79 (6th Cir. 1990)

> (quoting *Aronson v. May,* 85 S.Ct. 3, 5, 13, 13 L.Ed.2d 6 (1964) (Douglas, J., in chambers)). Simply put, "[m]erely to find that there is a substantial question is far from enough." *Lee,* 989 F.2d at 871 (quoting *Glynn v. Donnelly,* 470 F.2d 95, 98 (1st Cir. 1972)).
>
> Neither the United States Supreme Court nor the United States Court of Appeals for the Sixth Circuit has provided definitive guidance for determining whether a petitioner's "circumstances" are so "exceptional" as to justify release pending review of his habeas claims. Unpublished decisions from this Court suggest that "exceptional circumstances" warranting release during review "have been limited to situations where (1) the prisoner was gravely ill, (2) the prisoner committed a minor crime and is serving a short sentence, or (3) possibly where there was an extraordinary delay in processing the habeas petition." *Scheidler v. Berghuis,* 07–cv–01346, 2008 WL 161899 (E.D.Mich. 2008) (citations omitted); *see also Milstead v. Sherry,* 07–cv–15332, 2009 WL 728540 (E.D.Mich. 2009) (citation omitted). This much is clear: federal courts very rarely find "exceptional circumstances" and very rarely release petitioners before ruling on the merits of their claims. Indeed, there seem to be but a handful of decisions in which federal courts have released petitioners pending review of their claims.

*Blocksom v. Klee*, No. 11-cv-14859, 2015 WL 300261, at *4 (E.D. Mich. Jan. 22, 2015); *see also Pouncy v. Palmer*, No. 13-cv-14695, 2020 WL 2513094, at *1–2 (E.D. Mich. May 15, 2020). In short, White is entitled to release on bond only if he shows that (1) his petition raises a substantial legal claim and (2) exceptional circumstances justify his release.

**III**

White contends that the combination of the COVID-19 pandemic, his health issues, and his status as a prisoner constitutes exceptional circumstances warranting his release on bond. According to White, he "is at particular risk of serious illness from COVID-19 because he suffers from diabetes, hypertension/high blood pressure, [and] obesity." (Mot. for Bond, ECF No. 8, PageID.4481.) And White contends that COVID-19 "has invaded Carson City West and Mr. White will suffer serious consequences, even deadly, if he becomes ill." (Addendum to Pet.'s Mot. for Bond, ECF No. 19, PageID.4724.)

White's contentions about COVID-19 having entered Carson City West and posing an immediate threat to his health and safety rest upon an affidavit, dated July 19, 2020, that he has submitted. (*See* White Aff., ECF No. 19.) White is currently incarcerated in the 900 Building at Carson City. (*See* Rewerts Second Aff. ¶ 15, ECF No. 21-1, PageID.4772.) White's building is nearby the 300 and 400 Buildings. (*See id.* ¶ 16.) White's affidavit details why he believes there is a risk that COVID-19 will spread beyond the "COVID-19 Units" that prison officials set up in the 300 and 400 Buildings to house prisoners who tested positive for the virus or who might have the virus:

> It is my understanding that the [MDOC's COVID-19] protocols . . . were not followed with the COVID-19 unit [in 400 Building] that was placed here at Carson City or in

> the gym house [in 300 Building] where sick prisoners were quarantined.
>
> For example . . . . [i]t is my understanding that prisoners would take food carts from the food service area in the main prision directly to the COVID-19 unit without going to sallyport. Such conduct is contrary to [the MDOC's] procedures . . . .
>
> The carts were returned from the COVID-19 Unit to the main prison food services area with dirty trays and trash after the sick prisoners had finished their meals. These dirty trays were mingled in with the dirty trays from regular prisoners for washing, what I call a half washing since there is not a thorough cleaning of trays. . . .
>
> [T]he Warden states that there are no staff member[s] or prisioners who have tested positive. Asymptomatic staff members and other visitors to the complex are not tested when they enter the complex according to guards I have spoken to. In addition, prisoners have only been tested once a couple of months ago prior to the closing of the COVID-19 Unit and my cellmate has not been tested at all because he has refused the test; other prisoners have also refused the test.
>
> [Under the MDOC's COVID-19 protocols,] "custody and nursing staff" who work in the COVID-19 unit will have no contact with other prisoners at Carson City. The foregoing protocol fails to mention that staff working in the COVID-19 unit are reassigned and rotated to the main prison unit so that they have contact with prisoners in the main unit after reassignment. I have seen staff who work in the COVID-19 unit in my unit on a different week of the month. . . . The gym was also used to quarantine prisoners with symptoms. Guards and staff went in and out of this building without PPE except face masks.
>
> The insulin window where I go twice a day is about 50 feet from the COVID-19 Unit. The phone bank where

> prisoners make calls is attached to a wall where the gym is housed.

(White Aff. ¶¶ 3–8, ECF No. 19, PageID.4726–4728.)

But the Warden at Carson City West, Randee Rewerts, has submitted two competing affidavits demonstrating that, in certain key respects, White is either operating under mistaken assumptions or simply wrong.[1] (*See* Rewerts First Aff., ECF No. 13; Rewerts Second Aff., ECF No. 21-1.) In particular, in Rewerts' Second Affidavit – dated August 11, 2020 – Rewerts responded to White's affidavit by clarifying that:

> The 400 Building was a COVID-19 Positive Unit from 4/2/2020 – 06/28/2020. The 400 Building was reopened as a COVID-19 Positive Unit on 7/31/20. [T]he 400 Building sits outside the secure perimeter at Carson City Correctional Facility.
>
> The newly reopened COVID-19 Positive Unit (400 Building) currently houses 99 prisoners who have tested positive for COVID-19, which includes the one (1) prisoner that tested positive at DRF, the rest of the prisoners were transferred to our COVID Positive Unit from other facilities throughout the state. There are six (6)

[1] Rewerts' Second Affidavit also updated the Court that, as of August 11, 2020, one prisoner in the main buildings at Carson City (i.e., not housed in the 300 or 400 Buildings) tested positive for COVID-19. (*See* Rewerts Second Aff. ¶ 13, ECF No. 21-1, PageID.4770–4771.) The prisoner was placed in isolation and then in 400 Building to quarantine. Six prisoners who came into contact with the prisoner who tested positive were placed in 300 Building to quarantine, and they all have since tested negative for COVID-19. (*See id.*) Additionally, one Carson City staff member has recently tested positive for COVID-19. (*See id.* ¶ 14, PageID.4771–4772.) Accoridng to Rewerts, the staff member had not been at Carson City for over two weeks before she came into contact with COVID-19. (*See id.*)

prisoners currently housed in DRF-West 300 Building, gymnasium who were housed in the same bay as one prisoner that received a positive COVID-19 test result as part of his pre-parole process. Each of these prisoners have been tested twice (07/30/2020 and 08/06/2020) since being isolated in 300 Building and all have received negative test results. The six prisoners will be tested again on 08/13/2020, if they continue to remain negative they will be returned to general population, per protocol. The prisoners have been asymptomatic.

. . . [S]ignficant measures are being taken to prevent the transmission of COVID-19 from prisoners housed in the 400 Building and the remainder of the prison population at Carson City Correctional Facility. . . . Prisoner porters and staff working in 400 Building do not interact with staff working, or prisoners housed, in any other areas of Carson City Correctional Facility.

. . . [S]taff that work in the 400 Building work only in that unit and do not enter any of the other buildings at DRF while the 400 Building is operational. Custody staff working 400 Building are *not* being rotated throughout assignments inside the facility. They are not reassigned or rotated to other areas of the facility while assigned to 400 Building. Additionally, nursing staff that worked in 400 Building were COVID tested prior to returning to work within the main part of the facility, even though it was not required.

There are two prisoner porters that volunteered for the 400 Building, including for food delivery to the building, and they are housed in that building for the entire time that it is in operation. These two prisoners are not in contact with any of the prisoners from the main facility while they work in 400 Building. They use all PPE's and follow protocols. None of the staff nor the two prisoner porters have tested positive for COVID-19. . . .

> With respect to food service specifically, meals are served in Styrofoam containers that are disposed of after use in 400 Building. No items going out to 400 Building in the food cart are returned in the food cart. . . .
>
> Meals served to the prisoners in 300 Building are transported in plastic bags and served in disposable containers. Nothing from Food Service going to 300 Building is returned to Food Service. . . .
>
> [White] presently resides in the level II 900 building. . . . To the best of my knowledge, Mr. White has not tested positive for COVID-19, nor has he or any other prisoners or officers working in his 800 or 900 unit come into contact with any COVID-19 positive prisoners.
>
> Mr. White's current building is approximately 250 feet from the 300 Building. Mr. White's current building is approximately 1,400 feet, using sidewalks, 872 feet diagonally, from the 400 Building.
>
> Additionally, the "insulin lines" are not 50 feet away from the COVID Positive Unit. Using the sidewalks, the location for receiving insulin is 1,150 feet, or diagonally 355 feet, from 400 Building. The distance from the "insulin line" to the 300 Building is 400 feet. Although, as previously mentioned, the 300 Building does not house any COVID-positive prisoners.
>
> Prisoner porters working in 300 Building do not come into close contact with the six prisoners on isolation status in 300 Building, nor do the prisoner porters "take care of" the prisoners in isolation status in the gymnasium of 300 Building.

(Rewerts Second Aff. ¶¶ 5–18, ECF No. 21-1, PageID.4766–4773; emphasis in original.)

After reviewing the competing affidavits, the Court is not persuaded that there are sufficiently compelling circumstances to warrant White's release at this time. While the Court appreciates and shares White's concern for his safety, the Court is not yet perusaded that COVID-19 currently poses a sufficiently high risk to White as to constitute "exceptional circumstances" as that term is used in the habeas bond context.[2]

**IV**

For all the reasons explained above, White's Motion for Bond Pending Conclusion of Habeas Proceedings (ECF No. 8) is **DENIED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: August 24, 2020

[2] The Court is willing to reconsider its conclusion that extraordinary circumstances do not exist if, while White's habeas petition is pending, White later demonstrates to the Court that he has experienced a substantial change in his health conditions and/or that the Carson City Correctional Facility has experienced an outbreak of COVID-19. If White later persuades the Court that exceptional circumstances exist, the Court will then proceed to decide whether the legal issues he has raised are sufficiently substantial to warrant bond. The Court is currently conducting a careful review of the claims in the petition.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 24, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764